Thank you, Your Honor. Good afternoon, and may it please the Court. Matthew Helland of Nicholas Caster for the Plaintiff Appellants. I'd like to start with a question that Judge Watford asked towards the beginning of the argument in the last case, which is what is to distinguish this from a minimum wage and overtime claim from the perspective of projecting the laws into another state. The case that's been cited for that is the Brown-Forman case from the United States Supreme Court, and I think the key difference is this. From a dormant commerce clause perspective, what the Court should be looking at is whether there is regulation on out-of-state economic activity, regulation on commerce that occurs out-of-state. And in Brown-Forman, the issue was New York had a rule that once you set your price for liquor, there were restrictions on whether you could change your price. And the result of that was that once the prices were set and were registered in New York, then that company couldn't change their prices in New Jersey without getting approval from New York. So the effect was that New York was regulating economic activity that was taking place in New Jersey. Here, we don't have that situation because by requiring application of Section 226, there's no regulation of out-of-state economic activity. There's only regulation of what must be reported on a pay stub. And so that's one potential difference between this rule and the rule as it might be applied from a dormant commerce clause perspective. What about the timing requirement that's at issue in your case? That seems much more akin to regulation as you're putting it out-of-state economic activity. What California is regulating there is a one-time event that occurs once per pay period. And really that is the same between 226 and 204. It's a one-time event, the payment of wages. But it's requiring, it's allowing California to dictate when somebody is entitled to payment for 97% of their time that they spent outside of California. And I don't see, why does California get to dictate that? The distinction, as I see it, is this. California isn't saying what must be paid for those hours that are worked elsewhere. And it isn't saying how it must be paid. But California is saying for an employee that has a relationship with the state, as the California Supreme Court has defined here to be an employee who is based in the state, California sees that as a significant enough relationship that California has a right to ensure that those employees who are connected to the state are paid on time. It's not regulating the amount of pay. Why can't California say that we want our people to be paid at least $15 an hour? I just don't get the difference. Well, I would say there's two differences. One, that issue, as I see it, is more of an extraterritoriality issue. That's what we're talking about here. That's the whole issue. That's a separate branch of the Dormant Commerce Clause analysis. The case that you mentioned is only one in a line of cases that involves that. But that's what I'm asking. You frame it as California is not entitled to impose its law on out-of-state economic activity. And that's clearly what the Supreme Court has told us. But I don't understand, especially for the pay timing requirement, how is that not exactly what California is doing here? The difference is because California is not regulating the wages as they are earned or the wages how they must be paid. It's not regulating the rate of pay for that time that's worked outside of the state. It's simply saying, if you are an employee where the relationship has a connection to the state of California, that the California Supreme Court has recognized is significant enough for California to regulate, then that payment must be paid on time. And that's the distinction, as I would draw it. I would like to address some points that are particular to our case that weren't addressed previously. The base of operations test does make compliance easier, not harder. Because Delta, like United, knows where its flight attendants are based. That's a known fact. Delta argues that it would have to examine on a pay-period-by-pay-period basis where the employee presents him or herself for work. But that's simply not the case because Delta designs the bid periods and the bid structure such that all San Francisco-based flight attendants show up for the start of their rotation in San Francisco and they end back in San Francisco. Same with Los Angeles. The bid system ensures that flight attendants show up for the beginning of their rotation at their bid airport. Is that assignment of a home-based airport, is that a relatively permanent thing? Or does that change often during the course of the year for a given employee? An employee has to apply to change their home-based airport. And the bid system is a once-per-month bid structure, and you bid based on your home-based airport. And so the bid sheets are distributed or made accessible to everyone who is on record of having a base airport at San Francisco. You have the ability to bid on the San Francisco rotations, and you bid that rotation. You can put in to change your base. It's not in the record how frequently that happens, but there are procedures and protocols for flight attendants to go through to change their base. And if they do, then they bid the other base. And so it's known before the month even starts by Delta, which flight attendants are at which base. I don't know if you, maybe you don't know the answer, but just in the airline industry, do flight attendants and pilots and the like, do I assume they keep the same home-based airport relatively permanently? It's not like it changes every month or something. Correct. My understanding, they do, because there are implications to changing your base. Most specifically are that you have to get yourself to that base to start your rotation. And so if you're in San Francisco and you're bidding out of Detroit, it's your responsibility as a flight attendant to get yourself to Detroit for the start of your rotation. And so it is a more permanent structure rather than a fluctuating structure. But the other point that I'd like to raise that I think is important to understand, again, just as far as the way the industry works, is this idea that it would be difficult for the airlines to determine whether a flight attendant spends more than 50% of the time in a different state. That is completely divorced from reality. Again, we have flight attendants who bid and start the rotation either in SFO or at LAX. In order for a California-based flight attendant to spend more than 50% of their time in a different state, the rotation would have to be designed so that they fly from SFO to another large, geographically large state, say New York or Florida. And then they spend two or three days flying puddle jumpers from JFK to Albany to Detroit and back and staying completely within that state for two to three days before turning around and flying back to California. And that's simply not the way these rotations are designed because it's incredibly inefficient to rely on San Francisco-based flight attendants to be flying puddle jumpers around New York or around Florida. And so just as a practical matter, that's- It's possible it could happen like once a year or something though, isn't it? Because someone could be stuck in a blizzard. I mean, if they get to New York and then they're stuck there for three days because the airport is closed or something, that's, at least in theory, could happen like on a shift at some point. It is possible. And I agree with the tone of the questioning in the last- happens. There is no negative consequence to the employer other than providing a California-compliant pay stub. And certainly, if the employer is complaining about burden, if they don't want to- the burden on providing one extra pay stub that complies with California state law is much less than tracking all of this time just to find an eventuality where that might happen so that they can withhold information from their flight attendants. And so our point on both of those, on the base airport and on the 50% rule, is that these hypotheticals are so divorced from the record and so divorced from reality that they cannot, at this point, create a constitutional question that would undermine the California Supreme Court's decision on the certified questions that this court presented to it. And the same point is true on the legal conflict. And the case I would refer to there is Rocky Mountain Farmers versus Corey. And that's where this court held that if you're looking at a potential legal conflict, it must be actual and imminent to support a dormant commerce clause. So there can't be a dormant commerce clause problem, successful challenge, just based on the idea that some other state might do something. And the point is very well taken that if some other state passes a wage statement statute that conflicts with California or interprets it such a way that it conflicts with California's rule, then that challenge is to be made in that other state and in a future case. There's no such conflict, legal conflict, in front of the court right now. I'd also like to point the court to Hearst versus SkyWest. That's a Seventh Circuit decision on dormant commerce clause in the airline industry here. Neither United nor Delta raises it in their briefs. Delta's well aware of it, not only because we cited it in our brief, but also because when the district court decision was in favor of the airline, Delta cited it to the California Supreme Court. And now that decision has been reversed. It's the most relevant circuit authority on this point. And neither Delta nor United have provided any basis for this court to disagree with the holding that the Seventh Circuit reached. I think the problem is the analysis there is pretty inadequate, actually. And it seems to not be in line at all with what the Supreme Court has said is the full sweep of the dormant commerce clause. It's one branch. It takes on one branch of that jurisprudence, but it kind of ignores everything else. And our circuit law certainly doesn't allow us to do that. I think that's probably why you haven't heard much about that Seventh Circuit case. All right. And I guess I would just refer back to the previous points that I've made on our view of brown foreman and regulating out-of-state economic activity, which we don't think that the 226 does. I would like to spend just a minute on the merits of the wage statement claims, because this litigation has been long running, and quite frankly, we'd like as much resolved by this panel as we can get resolved today so that we're not back in front of the Ninth in three years on things that we don't need to be here on. And so on the merits of the wage statement claim, there was no dispute below that the wage statements were deficient. There was no dispute below that the violation was knowing and intentional. Those elements are fixed in the record, and in our view, they warrant a reversal with remand with instructions to enter judgment in our favor on the 226 claims. A couple points that Delta raised in its supplemental brief. Delta cites to Arroyo versus International Paper. It talks about a good faith defense to wage statement liability. Arroyo doesn't establish a good faith defense. The standard is knowing and intentional. Arroyo addresses a Rule 56D affidavit where one side was asking to take more discovery, and it references the good faith argument in passing, but it certainly doesn't reach a conclusion that there is a good faith defense under 226. And even if it did, Delta hasn't put that defense in the record. And any defense like that would need to be based on evidence, and Delta hasn't put any evidence in the record here. Which would suggest that probably we shouldn't have any business resolving the issue in the first instance ourselves, right? Well, I think... Sorry, Your Honor. Go ahead. I think the court should conclude that there is no... to wage statement penalties. It's a knowing and intentional standard that's in the statute. That was briefed below, and Delta didn't provide any response to our facts showing that the violation was knowing and intentional. So our point is that the standard was fully briefed below. Delta didn't put in a response, and so has waived any response, both on the liability and on the standard. And then the other point I want to make on that is that we are not asking for this court to rule that every single wage statement across all of the plaintiff's employment violated or gave rise to penalties. In order for us, in order for the court to reverse and remand the court with instructions to enter judgment in our favor, the court only needs to determine that Delta violated the law. And this goes to Delta's point that while we don't know whether the flight attendants were in another jurisdiction more than 50% of the time, and I just would point the court to Delta's expert report at 127 in the supplemental excerpts of record, where Delta's expert outlines for one specific pay period where all the flight attendants were. They spent very little time in any other state, and that's sufficient in our view for a merits finding by this court that Delta's wage statements were noncompliant, the violation was knowing and intentional, and at least for this pay stub identified by their expert, the flight attendants didn't spend more than 50% of their time in another state. And with that, I'll reserve my minute. Okay, very good. Let's hear from counsel for Delta. May it please the court. R.J. Hendricks with Morgan Lewis & Bacchus on behalf of Delta Airlines. I think the court's initial analysis of there being two differing standards with respect to dormant commerce clause preemption is a good place to start. In the first instance, we believe that based upon the decision of the California Supreme Court, it is clear that California is directly attempting to regulate economic activity, interstate activity, with respect to both 226 and 204. It's dictating to an out-of-state employer, Delta, who's based in Georgia, incorporated in Delaware, how it needs to report pay, for example, Lair, a Nevada resident, including periods of time when he was working in Minnesota or Michigan or other places outside of California. The California Supreme Court made clear that the standard of the law is the complete payroll period, regardless of where the work was performed. And in making that clear, it is indicating that the intent of 204 and 226 was to project its law outside of California, not simply focused on the work being performed in California, but project its law into other states and dictate to employers how they need to pay for time worked outside of California, both with respect to the timing of pay, as well as the reporting of that pay. So isn't that an argument that no state could do anything in this regard, though, any kind of wage statement regulation? Because if California tried to limit it and said, OK, well, you only have to give the wage statement for the hours actually in California, then you would really say, well, now we really have a burden, because now we'd have to give another wage statement for the hours somewhere else. That's not really what California is saying here, or that, as far as we know, any other state is saying either. So I don't really understand how it's a Dormant Commerce burden to do something that is actually only requiring you to do one thing. Well, the first instance is with respect to that question. That's the reason why we have the Dormant Commerce Clause, because states can always come up with rationales as to why to project their laws into other jurisdictions. And their motivations for doing so, the wisdom of doing so, all of those different considerations don't necessarily justify, as a matter of law, the projection of their power into another state and telling an out-of-state employer such as Delta how it needs to port pay occurring outside of that state. Would it be better for your clients if California said, we want you to give a California wage statement that is only for the hours spent in California? I think that's just as problematic for the reasons you indicated. Remember, this case arises in the context of the airline industry. The Ninth Circuit has indicated, as well as the U.S. Supreme Court, that if there's any sort of industry that needs uniformity in regulation, it is this industry. But this is what we understand. We are not dealing with— It seems like you could go to Congress and ask for preemption, but we don't have any specific preemption or express preemption here. The industry, the big industry, that could ask for that from Congress, but instead you're asking for it from us, and I don't understand that. We're asking for it because California has taken it upon itself to write statutes in which it is consciously attempting to project its will into other states. I mean, the jurisprudence— I mean, it would be just as bad if they didn't. If they only said, give us a wage statement for the hours in California, it would be just as bad. We couldn't do that either. It would present its own burdens, but it doesn't preclude us from making that argument. California would be on better ground from the standpoint of California if it limited its regulation to things occurring within California. That would not bar us from raising an argument that's saying, look, we have states, we have municipalities, we have all sorts of jurisdictions that are imposing all sorts of obligations of the timing of pay, the content of pay statements, how those pay statements are presented, what information needs to be in those pay statements. Given that we have such a large interstate component of our workforce, it's hard for us to manage that. Let's put this in context. California is also a state that has the Private Attorney General Act, which imposes significant civil penalties if you don't comply with these sorts of regulations. So this is not some sort of minor issue. We have Damocles Act swinging above us. If we don't comply with it, arguing that it's preempted, not having a ruling yet with respect to that, then we risk being subject to millions of dollars of liability. And that addresses the point that the court raised earlier. We should not have to wait for some other state to implement a particular law or to deal with a particular conflict. If, in fact, as we present here, if California can implement laws like this, other states can. Massachusetts has a law that says that their wage hour follows their employees even if they're traveling outside of the state. It is not beyond expectation that states have created laws with different standards. They have every right to expect that their laws will be enforced just like California expects that its laws will be enforced. In that framework, we're in an untenable position. It represents a great burden. But again, we don't even get to the issue of the balancing test because California, as a matter of constitutional law, is not entitled to project its laws into other states. Look at Laird for a moment. And we point these facts out in our brief significantly. During the one-pay period from November 1st to the 15th of 2015, he was a Nevada resident, worked six consecutive days, 12 flights he worked. He touched eight different states, including the District of Columbia. Eight of those 12 flights departed and landed in airports outside of California. And the only connection he has is that for a couple of hours, he happened to start the And California can dictate when 94 percent of his time during that pay period is outside of California, California can dictate for all of that time when it must be paid and the content of reporting that pay. There is no justification for that. So the notion that California, and this goes to Judge Wofford's point, simply because California hasn't done it yet, the argument that's being presented, the rationale by the court, the Supreme Court, would in fact justify them attempting to expand minimum wage, saying, look, you're based in California and you started there. We think it's important. We want you to make sure that you pay minimum wage. There's no conceptual demarcation that's been presented by either the court or the plaintiffs as to how that would not be justified under the same principle or other states reaching the same conclusion. Hey, we see that California can project its law. We want to project our law. The reason why we are arguing dormant commerce cost preemption is because as an industry that requires a level of uniformity with a high degree of its workforce working interstate, as to that workforce that works interstate, we need protection from the onslaught of multiple regulation that we have to process in real time, interpreting different standards. And if we make a mistake, oh, there goes civil penalty paga. You're going to have tens of millions of dollars of liability. In order for us to comply with this, we don't track how much time people spend in different jurisdictions. We would have to create that functionality in order to do that. As you heard with the United, our case did involve a very complex pay system, a pay system which the Supreme Court agreed was compliant. But it's not time-based. It's not hourly. It's a credit-based system. We would have to engage in conversions. I might add, conversions that still would not necessarily reflect a pay rate that the flight attendant population is used to. So there are things that we would have to do in Georgia in order to make sure that we comply with California law that's telling us to do things for work being performed in Michigan or Illinois or in Minnesota or other locations.  Total hours though, right? I mean, you don't have to do anything in Georgia other than count how many hours someone is working. Again, the most natural calculation that we have relates to duty hours and it relates to flight hours. But the California regulation requires a pay rate for that. And those rates don't conform with the credit-based system that we present. We can do mathematics, but that rate is not, as the California Supreme Court indicated, the purpose of the statute is to express how people are being paid. But the pay statement requirements are not in alignment with how we lawfully pay them. So that's going to create an administrative burden and problem for us to figure out. It is not as simple as plaintiff is suggesting. And we don't engage in the tracking that they're suggesting. Is that just an argument that you actually are in compliance though? Because in reality, you've given the information that's needed? Well, I believe that as a matter of law, that should be the conclusion. But until there's a decision indicating that, again, we're in peril. That's the problem that we have. Municipalities and states can pass laws and we're left to interpret whether they apply, to what extent they apply, which state's law controls, which state's law doesn't control. And if we make a wrong judgment on that, for multiple states, multiple jurisdictions, we're exposed to penalty. That's outrageous. That's a burden that reflects a patchwork of laws that exist and are increasingly being promulgated by states and municipalities. It is unworkable for an airline with this much presence interstate, pilots and flight attendants, to be able to manage that in a meaningful sort of way. We will get from suit to suit to suit, have pillages, and then wait years to figure out, did we do it right or did we do it wrong? That is not what the airline, which again, the federal government has indicated needs uniformity, should be confronted with. So if the federal government says it needs uniformity, why don't we have a law that says, here's the federal rule for wage statements? And then it would all be— The federal law has—and I think this was a question that was raised previously. We do have the RLA. We do have the FLSA. There's a mechanism by which—there's a notion that somehow if no state's law applies—and this is really the predicate of the California Supreme Court decision. This notion that somehow if no state's law applies because a flight attendant doesn't work in any particular state for the majority of their time, somehow that represents a great harm or injury. It doesn't. On a certain level, that's a degree of hubris. The state should not be focused on whether its law can apply to a worker from Nevada working in Michigan. The focus should be, does the worker primarily work within the state, and how do we protect our workers here? Keep in mind this. No one has been able to articulate, given the fact pattern of Lair, again, someone who outside of the state. You're dealing with a Georgia-based employer. What is the local interest of California in deciding when Lair gets his pay? What's the local interest in California in deciding how that pay is recorded or the content of the pay statement? There isn't any. In fact, California doesn't even apply its wage and hour pay statement requirement to all of the people that are resident in California. Government employees, homework employees, workers aren't subject to this. So when you analyze the burden that we are articulating, subjecting the airline to a patchwork of laws with significant penalties. When the California Supreme Court issued its decision, it said the law was contemplated with the intent that one state would regulate the timing of pay and would regulate the content of the pay statement. And that state happens to be California, with a severe regimen of civil and statutory penalties. What is the local benefit being provided to California that Lair gets a pay statement that has certain content in it or that Lair gets his pay at a certain time? There isn't any. There's never been anything articulated. So you've been talking about patchwork, which I know is a phrase used in our decision in our patchwork, unless the law regulates prices, routes, or services. Can you speak to how this regulates prices, routes, or services? My memory of DILT is that DILT was an Airline Deregulation Act case. And in that context, the statutory framework of DILT is about rates, routes, and service. Dormant Commerce Clause is not so limited to that. And it's looking at a larger sort of consideration of whether a state is overstepping its bounds by projecting its laws and regulating conduct in other states. But the patchwork idea is that there is regulation of all of these things at once. And I think maybe you have a different answer. But your friend from the earlier case said, so far, no one else is going after the airlines other than California. So where's the patchwork? Well, the patchwork is one state that would require us to give a pay statement in six days. Like Michigan, 14 days after the close of the payroll period. That's when you do it. Massachusetts requires it in six days. California is in seven days, okay? So why don't you just give it within six days, and now you've complied with all of them? So now we have to chase each state. Every time a state regulates a law, we take the state that's the most aggressive, and we have to suddenly adapt to that, okay? Every state, every municipality that wants to pass some sort of law, they can now begin to regulate us in that way. And we, as the airline, have to adapt to that through 50 states and even more municipalities. That is what's unworkable. Yes, and I'm asking this on the patchwork point. I'm confused by this, because I thought what we were supposed to do is assume that basically all 50 states, or a substantial number of them, had adopted the same rule that's being challenged in our case, right? And if we were to do that, in other words, we were just to assume that all the other states adopted the same exact rule that California Supreme Court has promulgated here, there never would be, as I understand it, right? Because California would basically relinquish its authority to regulate anyone who was working more than 50% of their time in some other state, as well as anyone who was based in another state. So you'd only have one jurisdiction under this regime that we assume that all 50 states adopted the same rule. Only one state would be asserting authority over any given employee. And so I guess I'm confused about that. Why is there this patchwork of conflicting regulation? We are not asserting that that is the analysis. In fact, we think that states won't necessarily adopt. They're not obligated to adopt California's decision. They have their own interests. They have their own legislatures. They have their own sense of what's important to them. And the presumption that somehow California, by virtue of passing the statute and the Supreme Court interpreting it, is going to now be the law of the land, there's no predicate for that. States reach their own conclusions and are entitled to reach their own conclusions about how their law applies. And so to the extent this court allows California to apply its law, it's setting a precedent that other states can do the exact same thing. It's creating that morass of... in the same manner California has. That's my point. Why are we hypothesizing all of the other states kind of doing the worst thing imaginable, which is saying, if you were elected in our state, all of our wage and hour laws apply to you. Why would we contemplate that world as opposed to just saying, if other states did what California is doing, what would be the resulting mess or lack thereof? Two points. Footnote five to the Wart decision. The court goes through, for example, the Supreme Court, goes through different states' laws. And one of them, of course, is Massachusetts, which applied to traveling salesperson of a Massachusetts employer, even though he worked in... he resided in Florida and performed work in 19 different states. You know, New York might have a law that says it travels with the individual. You know, there's precedent in these other states that indicate that they will take a different view, they can take a different view than what California has taken. And therefore... So you should go to those states, and I'll talk about the patchwork that would happen there if that same law was adopted by everyone. But that's not the law we have here. So it's first in time. So we would believe that the issue is whether the state can regulate and project its law in the first instance. That is the initial consideration. And in this instance, our position is that California cannot project its law in that way. The law, as interpreted by the Supreme Court, is intended to regulate activity taking place in other states. And again, when we get to the balancing test, we've articulated the burden, having to accommodate these various sorts of laws, determining compliance on a payroll-by-payroll basis. We've not heard any argument as to why there is a local benefit for someone like Mr. Lair, a Nevada resident working out of state 94% of the time for a Georgia-based employer. Why does California get to say, oh, we're going to decide this, and because we're first in time, you don't get to look at whether we're projecting our law into a different state. My time is up, so I want to just simply say we disagree with plaintiffs regarding entering any sort of judgment on the 204 or 226 issue. Those issues should be decided by the trial court, who never really ruled on those issues, and should get the benefit of knowing what the standard is by the California Supreme Court, applying that standard and making a ruling under those circumstances. Okay, thank you very much. We appreciate your argument. We've got a little bit over a minute. Yes. Thank you. What I just heard from Mr. Hendricks was an impassioned lobby pitch for express preemption, and I would submit that we're in the wrong branch of government for that. Congress can preempt, and it hasn't, and in fact, I'll let the court know that prior to the 2018 midterms, the airline industry did push for legislation for express full preemption of all state wage and hour laws, and it went nowhere. Not only has Congress decided not to preempt, in the FLSA, the Congress included an express savings clause, saying that states can regulate wage and hour laws and can include greater protections for their employees, and so Congress has spoken. There is no preemption in this area. As to Mr. Lair... Well, to the extent that the Dormant Commerce Clause applies, which each of you disagree about, but that's, in effect, a constitutional preemption law, is it not? It is, and for all the reasons I outlined in my initial argument, we believe there is no Dormant Commerce Clause preemption here. The point that I would like to close with is that the truth is laid bare as we dig deeper into these arguments. Airlines don't think that any flight attendants spend 50% of the time in any one state. They think that they've pitched all along that these workers spend not enough time in any state for any state law to apply, and that's the endgame here. That's what the California Supreme Court saw, and that's what the California Supreme Court was worried about. That's the interest. Mr. Lair's pay period that Mr. Hendricks has outlined, in that pay period, Delta held on to part of his pay for six weeks before paying it to him. There's no federal remedy for that. The state of California said, for flight attendants who are based here, who have decided... in the state of California, have flight attendants work out of this space, the state of California has an interest in regulating, at this point, just those two things, that they get a pay stub that tells them what they got paid and how much they worked, and that they get paid on time. Thank you. Thank you very much. The case is submitted, and we are adjourned for the day.
judges: Watford, Friedland, Rakoff